**CONTINUATION OF AN APPLICATION FOR A SEARCH WARRANT**

I, Heather Williamson, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this continuation as part of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — specifically,

    a. One silver Apple iPhone 13 Pro Max ("**Subject Device 1**"), as described in Attachment A — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

    b. One purple Apple iPhone 14 Pro Max ("**Subject Device 2**") ("collectively hereinafter the "**Subject Devices**"), as described in Attachment A — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and the Federal Bureau of Investigation ("FBI"), and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa

Cartel. Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking organizations for potential violations of federal laws, including, but not limited to, unlawful importation of controlled substances, the distribution of controlled substances, manufacturing of controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, fentanyl, and other dangerous drugs, as well as money laundering.

3. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money

laundering, as well as conspiracy and attempt to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.

4. I know from my training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions. Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates. Mobile telephones are portable, and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement. Mobile phones often contain evidence of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time. Wireless phones or smart phones also have the capability of facilitating monetary transactions relating to drug dealing, including through the use of cash or bank applications that allow for the electronic transfer of funds.

5. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

b.  Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business and often store information related to the profits of their narcotics trafficking on their devices;

c.  User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

d.  Drug traffickers often use the Internet to look up various information to support their drug trafficking activities on their devices;

e.  Drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

f.  It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds on their devices. This evidence includes information related to currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers; and

g.  Drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service and

frequently keep copies of tracking numbers, receipts and photographs of packaged narcotics on their devices.

6. The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law enforcement officers concerning this matter. This continuation is intended to show only that there is sufficient probable cause for the requested search warrant.

7. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 and 846, distribution and/or possession with intent to distribute controlled substances, and conspiracy to do the same, will be found on the **Subject Devices**, which are described in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B.

### IDENTIFICATION OF THE SUBJECT DEVICE

8. The **Subject Devices**, the property to be searched, are described as a silver Apple iPhone 13 Pro Max and a purple Apple iPhone 14 Pro Max seized pursuant to the arrest of Anthony McMILLAN ("McMILLAN") by the Norton Shores Police Department for State of Michigan charges that include the possession of a controlled substance- 1000 grams or more, possession of a controlled substance- 50 to 449 grams, delivery/manufacture controlled substance- Ecstasy/MDMA, possession of a firearm by a felon, felony firearm and assault with a dangerous weapon. The

**Subject Devices** are currently located at a secure Norton Shores Police Department facility within the Western District of Michigan.

9. The applied-for warrant would authorize the forensic examination of the Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10. On January 21, 2024, Norton Shores Police Department ("NSPD") responded to a domestic assault call at 1474 Norwich Avenue in the City of Norton Shores. Upon arrival, uniformed officers knocked on the door and announced their presence, ultimately resulting in the victim exiting the residence to speak with officers. The victim told officers that she was in a dating relationship with McMILLAN for two years. She further stated that McMILLAN had been living at the Norwich residence since January. In summary, she stated that McMILLAN became upset with her and was looking through her cellphone when he then hit her all over her body and grabbed her by the neck strangling her. She then advised that McMILLAN grabbed a pistol that he keeps on his nightstand and placed a magazine inside the pistol and racked the slide. The victim said that McMILLAN then held the pistol under her chin and up to the side of her head. McMILLAN told her that she is

lucky he didn't have any bullets or she would be dead.  The victim told investigators that she believed the gun McMILLAN had was a real firearm.

11.    Upon the police arriving to the residence, McMILLAN stopped assaulting her, but covered her mouth and would not let her leave.  The victim was subsequently transported to Trinity Hospital and treated for her injuries.

12.    In order to enter the residence to search for the firearm described by the victim, NSPD Detective Kyle Neher obtained a State of Michigan residential search warrant for 1474 Norwich Avenue and a black, 2007 Chevrolet Tahoe bearing Michigan license plate NDN86 that was located in the driveway of the residence and registered to McMILLAN.  During the course of executing this warrant, investigators observed, in plain view, in the backyard a black trash bag in freshly disturbed snow[1]. Detective Neher seized the black trash bag and located inside the bag a Glock 21, .45 caliber pistol, two clear knotted plastic bags with a substance consistent with cocaine, and a large quantity of orange pills in heat sealed bags and additional sandwich bags containing suspected narcotics.  Additionally, investigators located a Ziplock bag containing suspected mushrooms, a clear knotted plastic bag containing purple and pink pills, two digital scales and a large quantity of unused clear plastic bags.

---

[1] While investigators were obtaining the residential search warrant, additional officers were assigned to secure the residence. A neighbor alerted one officer that they observed McMILLAN exit the east side door of the residence, at which time the officer ran to that side of the residence and witnessed McMILLAN walking back from the east side of the garage. McMILLAN was subsequently taken into custody and placed in a marked patrol unit.

Investigators also located **Subject Device 1** in the front southwest bedroom and **Subject Device 2** on McMILLAN's person.

13. After locating the suspected narcotics, NSPD Detective Kyle Neher obtained a second State of Michigan search warrant to include the seizure of any and all illegal narcotics, money, money related paraphernalia, drug records and distribution materials and any cellular telephones.

14. McMILLAN was subsequently taken into custody and lodged at the Muskegon County Jail pending State of Michigan charges, warrant 24-234864-FY.

15. McMILLAN was interviewed at NSPD by Detective Trombley. The interview was audio and video recorded and Detective Trombley read McMILLAN his Miranda Rights from a Miranda warning card. McMILLAN admitted that he was arguing with the victim and they were both pushing and grabbing each other. In summary, McMILLAN stated that he did not own a gun. However, he slipped up during his statement and said that the gun was not loaded, and hypothetically, if there was a gun, it wouldn't have had bullets in it. McMILLAN also provided Detective Trombley the passcode to his phone (**Subject Device 2**) in order to show the text messages between him and the victim. McMILLAN also stated that investigators would find mushrooms and ecstasy in the dresser drawers of his bedroom, but there was only enough for recreational use.

16. On February 14, 2024, investigators received Michigan State Police Lab Report GR24-536-2 regarding the submitted substances from the above described search warrant. The results indicate the presence of MDMA (Item #2), cocaine (Item

#3A and 3B) and methamphetamine (Item #4). The total weight of Item #2 was 29.60, the total combined weight of Item #3A and #3B was 113.11 grams, and the total weight of Item #4 was 1,108.12 grams.

17. McMILLAN's criminal history includes convictions for felony breaking & entering- a building with intent, felony assaulting/resisting police officer and deliver/manufacture marijuana, misdemeanor larceny, misdemeanor possession of marijuana and traffic violations.

18. The **Subject Devices** have remained in the possession of law enforcement since January 21, 2024, the date of seizure, and have been secured in a state such that the data contained on the Subject Devices have not been modified or altered since the date of seizure.

## TECHNICAL TERMS

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and

        downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that

        antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    f.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I know that the Subject Device has capabilities that allow it to serve as wireless telephone, digital camera, portable media player, and GPS navigation device. It also likely has the ability to connect to the Internet and was likely assigned Internet IP Addresses when connecting to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and whether the device was used in furtherance of drug trafficking.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have

been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on Subject Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Subject Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

24. *Manner of execution.* Because this warrant seeks only permission to examine the Subject Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

25. I submit that this continuation supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the items described in Attachment B.